## THE JOHN H. PEARSON.*

### FILIBERTO and others *v.* TAYLOR.

### ROLFE and others *v.* SAME.

*(Circuit Court, D. Massachusetts.* December 29, 1882.)

**1. SHIPPING—DEVIATION—DAMAGES FOR LOSS OF CARGO.**

In an action for damages for a deviation on the voyage, where the charter-party stipulated that the captain "engages himself to take the northern passage," a phrase which both parties admitted to be technical, the libelants are bound to show the meaning of the clause which they caused to be put into the charter-party, and its breach.

**2. CHARTER-PARTY—CONSTRUCTION—TECHNICAL PHRASES.**

If a charter-party contains a technical phrase subjecting the master to unusual duties, that phrase must be made clear by evidence; and if there are two constructions, the master may adopt either, without being guilty of a deviation.

**3. SAME—ADMISSIONS OF MASTER.**

The admissions of the master at the end of the voyage as to the meaning of a technical phrase in the charter-party are not conclusive on him or his co-owners upon the merits of the case.

In Admiralty.

The bark John H. Pearson was chartered to bring a cargo of oranges and lemons for the libelants from Palermo to Boston. The charter-party contained the words, "Captain engages himself to take the northern passage," inserted at the order of the libelants. The vessel sailed from Palermo January 7, 1881, arrived at Gibraltar February 18th, waited there one day for stores, sailed February 19th, met with severe weather, and reached Boston May 2d. The cargo was very seriously damaged. The course of the vessel from Gibraltar to Boston was a little to the south of the latitude of the Azores, averaging about lat. 36 deg. N., but lay south of this latitude for a few days, the lowest point being 33 deg. 18 min. The libel alleged that the master failed to take the northern passage, and exercised bad judgment in not keeping more to the north. The witnesses on behalf of the libelants testified that the northern passage was understood to be a passage north of the Azores to the "tail" of the Great Banks, and then home, and that the course of the vessel was in what is known as the middle passage. Some of the witnesses on the part of the ship deposed that the northern passage was whatever was not southern; others, that it was anything north of 30 deg. to 35 deg. or 36 deg., varying somewhat with different witnesses. There was no dispute that the southern passage was further south than this vessel went,

*Reversed. See 7 Sup. Ct. Rep. 1008.

namely, in the region of the trade-winds, which is about 18 deg. to 28 deg. N. There was a cross-libel for freight. The district court dismissed the libel for damage, and decreed for the libelants in the libel for freight.

*H. W. Putnam*, for libelants.

*F. Dodge*, for claimants.

LOWELL, C. J. I have examined the evidence with great care, remembering that my decision of facts is final. The evidence for the libelants tended to prove the importance of cargoes of fruit being kept cool, and that fruit dealers owning ships had been in the habit of instructing their masters to take the northern passage, not, as I understand it, usually, if ever, in those words, but to keep a northerly course, which had come to be considered the northern passage, and that this was north of the Azores, if possible, and if not possible, north of the latitude of the Azores as soon as possible. They said that when ships were chartered, especially within the last eight or ten years, the charter-parties had contained clauses binding the master to take this course. They introduced two charter-parties, C and D, which contained an agreement that after leaving Gibraltar the vessel should go to the northward of the Western Islands, if practicable, and keep north of that latitude unless forced south by stress of weather, in which case the log-book should furnish evidence of the fact. A third, containing an exactly similar clause, was put in by the defendants, on which was indorsed that should adverse winds prevent the vessel from going northward of the Western Islands, the captain might sail south down to latitude 34. These clauses agreed exactly with the definition of the libelants' witnesses, who deposed, besides, that the course taken by this vessel was known as the middle passage.

The witnesses for the ship, consisting of ship-masters and ship-brokers, said that the northern passage was anything which was not southern, or that it was any passage above 30 deg. to 35 deg. or 36 deg., varying somewhat. They considered the instructions were given, or inserted in charter-parties, to prevent masters from taking the easy and comfortable passage where the trade-winds prevail. The claimants introduced three charter-parties, E, G, and H, one of which contains the agreement that the master should not go below latitude 34 deg.; another that he should not go south of 32 deg.; and the third established 30 deg. as the southern limit.

The district judge decided that the libelants were bound to show the meaning of the clause which they had caused to be put into the

charter-party, and its breach, and that they had failed to do so. In the conflict of oral testimony he relied a good deal on the charter-parties, one-half of which were favorable to the defendant's views of the subject. It is now argued by the libelants that they are of little value in the discussion; but it seems difficult to overvalue them. Those favorable to the libelants were put in by them for the very purpose of showing what was the northern passage and much of the oral evidence was made up simply of a recollection of similar clauses. The contracts favoring the defendants have precisely as much bearing on the question. They show what latitudes the parties making them considered high enough for safety. The point in dispute was what has come to be, by general consent, the northern or safe passage for fruit, insisted on in contracts and instructions to masters. Those charter-parties confirm very strongly the defendants' contention, that anything north of about 30 deg. was a, or the, northern passage. There is no satisfactory evidence that the words "northern passage" were ever written into any contract before this charter-party was made. When the libelants who testified here instructed their correspondent in Palermo to insert an agreement for the northern passage, they might properly have expected him to define a course for the vessel. If he had done so, who can say whether he would have defined it like C and D, or like E, G, or H?

Again, the libelants argue that the district judge was wrong in requiring them to prove that the contract has the construction which they contend for; citing *Funcheon* v. *Harvey*, 119 Mass. 469. In that case the master sued for freight under a charter-party, which required him to take on board at St. Johns, Newfoundland, a cargo of fish with all convenient speed, and proceed to Cuba "direct." The fish was spoiled, and there was evidence tending to show delay, deviation, and negligence by the plaintiff. The court held that the burden was on the plaintiff to make out his whole case, including due diligence. No doubt that was a sound decision; but, by parity of reasoning, if the action had been against the master for the damage, the then plaintiffs (defendants in the principal case) would have the burden of proof to show a breach of the contract; and it follows that, if I am to go by burden of proof, I must decide one of these cross-actions one way and the other the opposite way. The burden of proof is of very little importance in most cases, and of almost none in the construction of a written contract, and I do not understand that Judge NELSON relied upon it; what I suppose him to have in-

tended to say, and what I say, is, that if the contract contained a technical phrase, subjecting the master to an unusual duty, that phrase must be made clear by evidence, or else that part of the contract is unintelligible; or, if there are two constructions, the master might safely adopt either, without stopping to inquire whether a few more persons believed it to mean the one than those who thought it to mean the other. In this sense, the burden is on the shippers in both cases.

I have not overlooked the evidence which seems to show that the master admitted to a witness that he had taken the middle passage. From this it has been argued with much force that, whatever may be the meaning of such a contract when made by others, these parties both understood that there is a middle passage distinct from the northern one, and that it is where the libelants say it is. After some hesitation, I have decided that this admission of the master must be taken like any other piece of evidence tending to show the meaning of the technical phrase, and not as concluding him and his co-owners upon the whole merits of the case.

Upon the whole evidence, I am of opinion that there was no technical deviation.

Nor was there such negligence as should require the ship to pay for the loss. There was a day when the master might have turned towards the north when he did turn towards the south; at least I think the preponderance of the evidence is so. But in these matters much discretion must be left to the master, who is on the spot, and who must decide at short notice. No ship could safely take a perishable cargo, if any error of judgment, not amounting to a rash and almost criminal negligence, should render the owners liable to damages.

Decrees affirmed.